No. 24-60109

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

**LIBERTY ENERGY INC., NOMAD PROPPANT SERVICES LLC,**

*Petitioners,*

**v.**

**SECURITIES AND EXCHANGE COMMISSION and UNITED STATES OF AMERICA,**

*Respondent.*

_____

On Petition for Review of an Order and Rule of the
Securities and Exchange Commission

_____

**EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND
STAY PENDING JUDICIAL REVIEW**

_____

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd # 407
Denver, CO 80206

R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
Caleb Orr
BOYDEN GRAY PLLC
801 17th Street Nw., Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

# CERTIFICATE OF INTERESTED PERSONS

## *Liberty Energy Inc. v. SEC*

No. 24-60109

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Liberty Energy Inc. Liberty is a publicly traded entity. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Nomad Proppant Services LLC. Liberty Energy Inc. holds more than 10% of Nomad's stock.

3. R. Trent McCotter

4. Jonathan Berry

5. Michael Buschbacher

6. Jared M. Kelson

7. Caleb Orr

8. Boyden Gray PLLC

9. Katherine C. Yarger

10. Lehotsky Keller Cohn LLP

11. Securities and Exchange Commission

12. United States of America

Dated: March 8, 2024

/s/ R. Trent McCotter

R. Trent McCotter

*Counsel of Record for Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... v

INTRODUCTION ...................................................................... 1

STATEMENT OF THE CASE .................................................... 3

ARGUMENT ............................................................................. 7

I.   Petitioners Are Likely to Succeed on the Merits ............................. 7

    A.   The Rule Violates the Major-Questions Doctrine .................. 7

    B.   The Rule Is Arbitrary and Capricious and Is Not Supported by Substantial Evidence ....................................... 22

    C.   The Rule Violates the First Amendment .............................. 24

II.  Petitioners Will Suffer Irreparable Injury ..................................... 27

III. The Equities and Public Interest Strongly Favor a Stay .............. 28

CONCLUSION .......................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health and Hum. Serv.*,
141 S. Ct. 2485 (2021) .................................................................. 14, 28

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011) ........................................................................ 10

*Am. Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008) ......................................................... 23

*AMI. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) ...................................................... 25, 26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................ 16

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .............................................. 8, 9, 10, 27

*BST Holdings, LLC v. OSHA*,
2021 WL 5166656 (5th Cir. Nov. 6, 2021) ......................................... 3

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ............................................. 22, 23, 24

*Central Hudson Gas & Electric Corp. v. Public Service
Commission*,
447 U.S. 557 (1980) ........................................................................ 25

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ................................................. 16, 18, 20

*Dubin v. United States*,
599 U.S. 110 (2023) ........................................................................ 13

*Elrod v Burns*,
427 U.S. 347 (1976) ........................................................................ 28

v

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ........................................................ 13

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................ 22

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .......................................................... 8

*People ex rel. James v. Exxon Mobil Corp.*,
    119 N.Y.S.3d 829 (Sup. Ct. 2019) ...................................... 21

*Mayor of Baltimore v. Azar*,
    973 F.3d 258 (4th Cir. 2020) ............................................ 29

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ......................................................... 16

*NAM v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ..................................... 24, 26

*NIFLA v. Becerra*,
    585 U.S. 755 (2018) ......................................................... 24

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................... 7

*Owner-Operator Indep. Drivers Ass'n, Inc. v. FMCSA*,
    494 F.3d 188 (D.C. Cir. 2007) ........................................... 23

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ......................................................... 16

*UARG v. EPA*,
    573 U.S. 302 (2014) ........................................................ 1, 7

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................. 7, 8, 10, 12

**Statutes**

15 U.S.C. § 77g ................................................... 8, 13, 14, 15

15 U.S.C. § 77i .......................................................................... 1

15 U.S.C. § 77j .................................................................. 13, 15

15 U.S.C. § 78*l* ................................................................. 13, 14

15 U.S.C. § 78m ........................................................ 13, 14, 16

15 U.S.C. § 78o ................................................................. 13, 15

15 U.S.C. § 78y .......................................................................... 1

28 U.S.C. § 2112 ...................................................................... 3

42 U.S.C. § 7414 ............................................................... 10, 11

**Other Authorities**

17 C.F.R. § 229.303 ............................................................... 17

17 C.F.R. § 229.101 ............................................................... 17

17 C.F.R. § 229.103 ............................................................... 17

17 C.F.R. § 230.408 ............................................................... 17

17 C.F.R. § 240.12b-20 .......................................................... 17

*Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656 (Nov. 6, 1975) ...................................................... 9

*Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916 (Apr. 22, 2016) ......................... 9, 14

*Climate-Related Financial Risk*, 86 Fed. Reg. 27,967 (May 25, 2021) ........................................................................ 10

*The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334 (Apr. 11, 2022) .......................................................... 4, 15, 20, 21

*Greenhouse Gas Reporting Program and the U.S. Inventory of Greenhouse Gas Emissions and Sinks*,
EPA, https://www.epa.gov/ghgreporting/greenhouse-gas-reporting-program-and-us-inventory-greenhouse-gas-emissions-and-sinks ................................................................ 11

Andrew N. Vollmer, *The SEC Lacks Legal Authority to Adopt Climate-Change Disclosure Rules* (Apr. 12, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20123525-279742.pdf ................................................................ 14

H. Rep. 116-563 (2020) ................................................................ 12

H. Rep. 117-39 (2021) ................................................................ 12

S. 3481, 115th Cong. (2018) ................................................................ 12

S. 2075, 116th Cong. (2019) ................................................................ 12

S. 1217, 117th Cong. (2021) ................................................................ 12

## INTRODUCTION

"When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism." *UARG v. EPA*, 573 U.S. 302, 324 (2014).

Petitioners—Liberty Energy Inc. and Nomad Proppant Services LLC—ask this Court to issue an administrative stay and a stay pending review of the Securities and Exchange Commission's rule, *The Enhancement and Standardization of Climate-Related Disclosures for Investors* (the "Rule") (Ex.A); *see* 15 U.S.C. § 78y(c)(2) (Court "may issue all necessary and appropriate process to stay the order or rule or to preserve status or rights pending its review"); *id.* § 77i(b).

The Rule directly or indirectly regulates significant aspects of the country's economy under the guise of requiring detailed (and wildly speculative) disclosures about "climate-related risks" and "greenhouse gas" emissions. Public companies must attempt to collect and calculate not just their own direct emissions and climate risks but also those of certain third parties, including climate risks faced by their *suppliers*. Public companies must also shoehorn qualitative environmental

information like "transition risks" and "severe weather events" into financial accounting that investors rely on for accurate financials.

The Rule is unique in the history of the SEC. Never before has it claimed the power to demand such broad "climate"-related disclosures, which will occupy a significant portion of public companies' SEC filings and subject them to increased enforcement and litigation. In fact, the SEC stated for nearly 50 years that it lacks the power to do so absent a change in statutory authority—which has not materialized.

A stay pending review is warranted. Petitioners are likely to prevail on the merits for several reasons. *First*, the Rule fails the major-questions doctrine. *See* Part I.A, *infra*. There is no clear authority for the SEC to effectively regulate the controversial issue of climate change, at an acknowledged cost of over $4.1 billion (a figure that is dramatically underinclusive)—a conclusion reinforced by the fact that Congress *has* given the Environmental Protection Agency clear authority to require detailed emissions disclosures.

*Second*, the Rule is arbitrary and capricious because it fails to account for the SEC's drastic change in position and is premised on

evidence the Rule admits is at-best mixed, which precedent holds is insufficient to justify an SEC rule. *See* Part I.B, *infra*.

*Third*, the Rule violates the First Amendment by mandating controversial disclosures using controversial frameworks and effectively mandating discussions about climate change. *See* Part I.C, *infra*.

Petitioners have also demonstrated irreparable injury in the form of unrecoverable compliance costs and constitutional injuries, and the equities also strongly favor a stay of the unprecedented Rule. *See* Parts II–III, *infra*.

This Court is expressly authorized to grant a stay in this case immediately. *See* 28 U.S.C. § 2112(a)(4); *BST Holdings, LLC v. OSHA*, 2021 WL 5166656 (5th Cir. Nov. 6, 2021) (administrative stay).[1]

## STATEMENT OF THE CASE

In April 2022, the Securities and Exchange Commission proposed a rule titled "The Enhancement and Standardization of Climate-Related

---

[1] The SEC was formally asked to "stay the effectiveness of the climate rule pending completion of all subsequent judicial review." Comment, https://www.sec.gov/comments/s7-10-22/s71022-20144376-309299.pdf. The SEC denied that request by not staying the Rule upon issuance. Further, the SEC's attorneys have informed the undersigned that the SEC does not agree to a stay.

Disclosures for Investors." 87 Fed. Reg. 21,334 (Apr. 11, 2022). The proposed rule was a thinly veiled attempt to inject the SEC into the world of climate politics by compelling publicly listed companies to disclose a breathtaking volume of information, much of it highly speculative, about greenhouse gas (GHG) emissions (including even by the company's *customers and suppliers*) and "climate-related" risks, on pain of severe government-enforcement and private penalties if any of those disclosures could plausibly be described as misleading.

On March 6, 2024, the SEC finalized the Rule. Although dialed back in a few places from the proposed rule, the Rule still represents a revolutionary change in securities regulation. The Rule requires many publicly listed companies (including Petitioner Liberty):

- To disclose "Scope 1" GHG emissions, meaning the company's own emissions from every activity the company undertakes (e.g., CO2 emissions from flying to a business meeting); *and* "Scope 2" emissions, meaning all GHG emitted by *third parties* in providing electricity and other energy power sources to the covered company. Ex.A.852.

- To disclose non-material information about company costs "related to severe weather events and other natural conditions." Ex.A.458, 844–47.

- To disclose granular faux-"material" and entirely non-material "climate-related risks" and the company's oversight of those risks, including risks faced by their "suppliers." Ex.A.117, 852–58.

The Rule says Scope 1 and Scope 2 disclosures are required when "material" to the company—and will be subject to attestation requirements imposing heightened liability risks—but the SEC then effectively deems that information material if the company has faced or reasonably might face "transition risk," Ex.A.246, which in turn is defined in a nearly unlimited manner, Ex.A.850–51.

The attached chart tracks how the Rule pervasively seeks to evade "materiality" requirements by omitting them altogether, watering them down, or effectively deeming certain things material. Ex.G.

Petitioner Liberty Energy is a leading North American oilfield services firm that offers cutting-edge completion services and technologies to onshore oil and natural gas exploration and production

companies. Ex.D (Wright Decl.) ¶2. Liberty is subject to the Rule. Ex.E (Stock Decl.) ¶7. From Liberty's perspective, the regulatory regime the Rule imposes is on par with that required by the Sarbanes-Oxley Act of 2002 (SOX). *Id.* ¶17. Liberty's direct, out-of-pocket compliance-related compliance costs for SOX exceeded $500,000 for the 2022 fiscal year, and total annual costs for SOX compliance exceed $1 million per year. *Id.* ¶18. Thus, even under a very conservative approach, compliance costs for the Rule will be several hundred thousand dollars per year, with higher costs at the outset. *Id.* ¶20. Those costs will begin accruing immediately because of the need to stand up complex data capturing systems. *Id.* ¶¶23–25.

Petitioner Nomad Proppant Services LLC is a service-based frac sand company. Ex.F (Johnson Decl.) ¶1. Liberty owns a significant portion of and exercises certain control rights over Nomad, which will compel Liberty to, at the very least, undertake a materiality assessment (the costs of which are unrecoverable) to determine whether Nomad's "climate-related risks" must be reported by Liberty and will compel Nomad to report its Scope 1 and 2 GHG emissions to Liberty. Ex.E¶¶26–33; Ex.F.¶¶10–12.

## ARGUMENT

The factors for a stay pending review are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I. Petitioners Are Likely to Succeed on the Merits.

### A. The Rule Violates the Major-Questions Doctrine.

Under the major-questions doctrine, when "agencies assert[] highly consequential power beyond what Congress could reasonably be understood to have granted," or "discover in a long-extant statute an unheralded power representing a transformative expansion of … regulatory authority," "there is every reason to hesitate before concluding that Congress meant to confer" the power claimed. *West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022). "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *UARG v. EPA*, 573 U.S. 302, 324 (2014).

Moreover, "[w]hen an agency has no comparative expertise in making certain policy judgments, … Congress presumably would not task it with doing so." *W. Virginia*, 597 U.S. at 729. "[W]e must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

As explained below, the Rule checks every box to trigger the major-questions doctrine by purporting to "derive[] its authority from an old statute employed in a novel manner, imposes [over $4] billion in compliance costs, involves broad [scientific] considerations that lie outside of [the SEC's] core competencies, and purports to definitively resolve one of today's most hotly debated political issues," i.e., climate policy. *BST Holdings, LLC v. OSHA,* 17 F.4th 604, 617 (5th Cir. 2021). Yet the SEC lacks any clear authorization, instead invoking only vague provisions authorizing disclosure requirements when "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1).

## 1.   The Major-Questions Doctrine Applies.

The Rule purports to "derive[] its authority from an old statute employed in a novel manner." *BST,* 17 F.4th at 617. The Securities Act was passed in 1933, and the Exchange Act in 1934. For the last 50 years, the SEC itself agreed that it could not mandate blanket climate disclosures.[2] Echoing its 1975 position, the SEC reiterated in 2016 that "disclosure relating to environmental and other matters of social concern should not be required of all registrants *unless appropriate to further a specific congressional mandate* or unless, under the particular facts and circumstances, such matters are material."[3]

Departing from this longstanding interpretation of its authority, the SEC would now "impose[] [over $4] billion in compliance costs," *BST,* 17 F.4th at 617; Ex.E¶15. The Rule also purports to "resolve one of today's most hotly debated political issues." *BST,* 17 F.4th at 617. The Biden Administration itself has made clear that climate issues— including disclosures—are among the most politically significant of our

---

[2] *Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656, 51,657 (Nov. 6, 1975).
[3] *Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916, 23,970 (Apr. 22, 2016) (emphasis added).

time. *See, e.g.*, E.O. 14030 of May 20, 2021, *Climate-Related Financial Risk*, 86 Fed. Reg. 27,967 (May 25, 2021); *cf. W. Virginia*, 597 U.S. at 731.

In short, the Rule "is an extraordinary exercise of regulatory authority by the Commission that involves economically and politically significant policy decision." Ex.C.2 (Comm'r Uyeda, dissenting).

Moreover, both emissions data itself and determining whether that data is material "involve[] broad [scientific] considerations that lie outside of [the SEC's] core competencies." *BST,* 17 F.4th at 617. The Rule largely adopts "third-party framework[s]" implemented by outsiders, Ex.A.54, precisely because such matters are outside the SEC's bailiwick, *see* Ex.B.2 (Comm'r Peirce, dissenting) ("We lack the expertise to oversee these special interest disclosures.").

Even more tellingly, Congress has already dictated that the EPA— not the SEC—has expertise over climate- and emissions-related issues, including the mandatory disclosures of climate information. The Clean Air Act tasks the EPA with collecting reports from emission sources and making them available to the public. *See* 42 U.S.C. § 7414; *see also Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011). It authorizes the EPA to mandate disclosure of emissions data on a "one-time, periodic, or

continuous basis" from "any person who owns or operates any emission source, who manufactures emission control equipment or process equipment, who the [EPA] Administrator believes may have information necessary for the purposes set forth in this subsection, or who is subject to any requirement of this chapter." 42 U.S.C. § 7414(a)(1). Congress even stated that "[a]ny records, reports or information obtained under subsection (a) shall be available to the public." *Id.* § 7414(c).

Pursuant to that statutory power, the EPA already requires the disclosure of GHG emissions from all facilities that emit more than 25,000 metric tons of CO2-equivalent per year and from all facilities that supply certain products that would result in over 25,000 metric tons of CO2-equivalent if those products were released. This information is publicly available through the EPA's website and covers more than 8,000 facilities, representing 85 to 90% of all U.S. GHG emissions, *see Greenhouse Gas Reporting Program and the U.S. Inventory of Greenhouse Gas Emissions and Sinks*, EPA, https://www.epa.gov/ghgreporting/greenhouse-gas-reporting-program-and-us-inventory-greenhouse-gas-emissions-and-sinks.

The SEC never even acknowledges these EPA statutes, let alone explains why Congress would give the SEC broader climate-disclosure power (and through vague disclosure provisions, no less) than it *expressly* gave to the EPA itself.

Finally, the Court "cannot ignore that the regulatory writ [the SEC] newly uncovered conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gas emissions 'had become well known, Congress considered and rejected' multiple times." *W. Virginia*, 597 U.S. at 731. Members of Congress have repeatedly proposed legislation requiring the SEC to mandate disclosure of emissions and climate risks, but those proposals failed to pass.[4] The SEC decided to act only when Congress declined to do so.

Because the major-questions doctrine applies, the SEC must identify *clear* authority for the Rule. It cannot do so, as explained next.

---

[4] *See, e.g.*, H. Rep. 117-39 (2021) (Climate Risk Disclosure Act); H. Rep. 116-563 (2020); S. 1217, 117th Cong. (2021); S. 2075, 116th Cong. (2019); S. 3481, 115th Cong. (2018).

## 2. The SEC Lacks Clear Authority for the Rule.

Congress knows how to provide clear authority to an agency to mandate disclosure of climate data: it did so for the EPA, as explained above. But the SEC has no similar grant of clear authority.

### a. Clear Authority for Balance-Book Information.

The SEC relies on statutory language authorizing disclosures when "necessary or appropriate in the public interest or for the protection of investors," and contends that provides broad authority to demand almost anything the SEC wants. 15 U.S.C. § 77g(a)(1); *see* §§ 77j(c), 78*l*(b)(1), 78o(d), 78m(a); Ex.A.59–69.

Read in context, none of those provisions authorizes the Rule, let alone clearly. Section 77g(a)(1)'s reference to "the public interest" and "protection of investors" must be construed with the rest of that same paragraph, which requires registration statements to include the specific information in "Schedule A." *See Dubin v. United States*, 599 U.S. 110, 124–25 (2023) (discussing *noscitur a sociis*); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018) (discussing *ejusdem generis*).

The SEC admits that Schedule A deals with "balance sheet and profit and loss statement[s]," Ex.A.68, and has elsewhere conceded the

list is "largely financial in nature," 81 Fed. Reg. at 23,921. Thus, under 15 U.S.C. § 77g, the SEC cannot require disclosures of just *anything* it thinks will be in the public interest. The information must be of the same nature as disclosures Congress dictated under Schedule A. *See Ala. Ass'n of Realtors v. Dep't of Health and Hum. Serv.*, 141 S. Ct. 2485, 2488 (2021); Andrew N. Vollmer, *The SEC Lacks Legal Authority to Adopt Climate-Change Disclosure Rules*, (Apr. 12, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20123525-279742.pdf.

Likewise, the grant of disclosure power in § 78*l* is cabined by the eleven expressly listed types of information that must be disclosed, which focus on management and balance-sheet information. 15 U.S.C. § 78*l*(b)(1)(A)–(K). And the SEC's power in § 78m incorporates that same limitation by allowing for disclosure of updated information required by "section 78*l* of this title." *Id.* § 78m(a)(1). It is also limited by a restriction to financial disclosures typically "shown in the balance sheet and earnings statements." *Id.* § 78m(b)(1).

These provisions provide clear authority only for standardized disclosure of management and accepted "balance-book" financial figures. But climate data and risks are of a completely different type: they are not

measurements of any traditional financial performance or indicator, and, in many cases, they are entirely outward looking. *See* Vollmer, *supra*, at 15–17. For example, the SEC never explains how a company's *own* GHG emissions somehow reflect its profitability. Rather, the SEC wants them just for disclosure's sake.

The proposed rule even repeatedly made Freudian slips distinguishing "climate-related disclosures" from *actual* "financial disclosures," 87 Fed. Reg. at 21,335, 21,411, a mistake that continues in the Rule itself, *see* Ex.A.856 (suggesting there can be "material impacts" that are not "financial").

> **b.** **The SEC Cannot Ignore Materiality or Deem Certain Non-Financial Information to be Material.**

The Rule lacks clear authority for another reason: the Securities and Exchange Acts' references to "the public interest" and "protection of investors" provide clear authority only for compelling the disclosure of information that is *actually* material to the particular company. 15 U.S.C. §§ 77g(a)(1), 77j(c), 78*l*(b)(1), 78o(d), 78m(a).

The Supreme Court has indicated that the "public interest" is not furthered by requiring companies "simply to bury the shareholders in an

avalanche of trivial information," which "is hardly conducive to informed decisionmaking" and thus would "accomplish more harm than good." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 (1970). The existing materiality requirement is thus part-and-parcel of the "public interest" text in these statutes.

As proof: when Congress wants the SEC to regulate *outside* the realm of materiality, Congress has provided express and separate authority to do so. 15 U.S.C. §§ 78m(p)(1)(A) (conflict minerals), 78m(q)(2)(A) (resource extraction), 78n(i) (executive compensation). No such authority exists for climate disclosures, of course.

Not "all facts which a reasonable shareholder might consider important" are material, *TSC Indus.*, 426 U.S. at 445, and the Supreme Court has cautioned against "administratively confining materiality to a rigid formula," *Basic*, 485 U.S. at 236. Moreover, information can be material only if it is "sufficiently specific." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

Given that companies must *already* disclose specific issues that are material on a company-specific basis under other SEC regulations,[5] why issue the Rule at all? The SEC wants to mandate disclosure of GHG emissions and climate risks even when they are *not* truly material.

The problem isn't that companies are actually omitting material information; the SEC conspicuously avoids justifying the Rule on that basis. *E.g.*, Ex.A.89. Rather, as the SEC and institutional investors see it, Ex.A.39n.102 (e.g., BlackRock, CalPERS, Harvard Mgmt.), public companies simply aren't focusing enough attention on the SEC's political cause du jour.

To force companies to talk about climate change, therefore, the SEC had to get creative when it comes to the statutory requirement of materiality, as summarized in the chart attached as Exhibit G to this Motion.

*First*, for several requirements, the Rule does not even purport to require materiality. Ex.A.852 (board's oversight of climate-related risks), Ex.A.844–45 (expenditures for "severe weather events and other natural

---

[5] *See* 17 C.F.R. §§ 229.303(a), 229.101(c)(1)(xii), 229.103(c)(3), 229.101(c)(5), 230.408, 240.12b-20.

occurrences" greater than $100,000); Ex.A.853 (management's "positions" and "committees" for managing climate risk), Ex.A.854 ("geographic location" of physical risks). For others, the Rule invents new, vaguely lower standards than actual materiality. Ex.A.854 ("potential material impacts").

*Second*, throughout the Rule, the SEC directs companies to disclose information that has material impacts "*on*" or is material "*to*" specific company activities, even when not material to the company overall. Ex.A.854 ("material impacts … on the registrant's strategy, business model, and outlook"); *id.* ("material impacts *on* … suppliers, purchasers or counterparties"), Ex.A.856 ("material *to* how [the registrant] evaluates and manages a climate-related risk").

*Third*, even when the Rule purports to require "materiality," it does so "in name only." Ex.B.2. Most notably, the Rule says a company must disclose Scope 1 and 2 emissions only if they are material, Ex.A.859, but then effectively deems materiality triggered when a company faces climate-change "transition risk," Ex.A.246, which in turn is defined so broadly that it sweeps in nearly every company.

For example, the SEC says there is transition risk when "emissions are currently or are reasonably likely to be subject to additional regulatory burdens," Ex.A.246, like when "governments including the United States and others throughout the world have made public commitments to transition to a lower carbon economy," such as the non-binding Paris Agreement, Ex.A.21n.34. All public companies operate in a country that is at least "reasonably likely" to adopt *non-binding* climate agreements. In fact, the Rule's requirements will *themselves* create transition risk, allowing the SEC to use the Rule to bootstrap reporting requirements.

That is just the start, though. The Rule's definition of "transition risk" is all-encompassing. It "include[s], but [is] not limited to": "increased costs attributable to climate-related changes in law or policy, reduced market demand for carbon-intensive products leading to decreased sales, prices, or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to

market behavior, changes in consumer preferences or behavior, or changes in a registrant's behavior." Ex.A.850–51. Under that definition, if a company's "customers and business counterparties" are deemed unpopular by environmental groups, that's a transition risk, and (for reasons entirely unexplained) the company likely must therefore disclose its Scope 1 and 2 emissions. *Id.*

There are other serious flaws with the Rule's approach to materiality. Caselaw holds that information can be material only if it is "sufficiently specific," *City of Pontiac*, 752 F.3d at 185, but climate risks are guesswork because they rely on subjective modeling about events with horizons occurring over decades, premised on a panoply of subjective assumptions. 87 Fed. Reg. at 21,445, 21,427; Ex.B.3. That is because there is great uncertainty about the risks that will (or will not) flow from temperature changes. *See* Spencer Decl.¶¶37-40.[6] Climate models are consistently wrong and "have also historically overpredicted temperature rise." *Id.* ¶47. Even if future temperatures could be predicted with certainty, these are not "what businesses are being asked to assess.

---

[6] *Available at* https://www.sec.gov/comments/s7-10-22/s71022-20132160-302652.pdf#page=95.

Instead, they are asked to apply extrapolations from these models to predict the effect of long-term weather changes on business operations." *Id.* ¶50.

Other courts have held that this defeats materiality. When New York sued Exxon, alleging it had failed to disclose material information about contributions to climate change, the court found that none of the information was material because "[n]o reasonable investor during the period from 2013 to 2016 would make investment decisions based on speculative assumptions of costs that may be incurred 20+ or 30+ years in the future with respect to unidentified future projects." *People ex rel. James v. Exxon Mobil Corp.*, 119 N.Y.S.3d 829, *19 (Sup. Ct. 2019).

\* \* \*

The proposed rule justified mass climate disclosures on the theory that *every company* faces transition risk because climate change is supposedly an imminent world-ending catastrophe. *See* 87 Fed. Reg. at 21,336. Having realized it cannot simply demand blanket climate disclosures, the SEC tries to accomplish the same thing by omitting or incanting materiality. Either way, it is still unlawful. Ex.G.

## B. The Rule Is Arbitrary and Capricious and Is Not Supported by Substantial Evidence.

The Rule is also arbitrary and capricious and lacks substantial evidence. *First*, the SEC did not explain the switch in its position, held for decades, that it lacks authority to impose such broad climate disclosures. *See* Part I.A.1, *supra*. An agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The SEC insists it hasn't changed its position at all, Ex.A.71–72, but of course the SEC has never before required such voluminous climate disclosures. These failures are necessarily arbitrary and capricious.

*Second*, when there is "at best" "mixed" evidence showing that an SEC rule "will result in improved board and company performance and shareholder value," the rule lacks substantial evidence and therefore is invalid. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011).

The Rule justifies itself on the theory that higher temperatures, droughts, and "exposure to physical climate risk" all reduce firm revenues, and that there is supposedly a relationship between climate information and asset pricing. Ex.A.647–49 & nn.2737–46. Of the dozens of articles cited as alleged support, however, the vast majority were never

mentioned in the proposed rule. That alone renders the Rule unlawful. *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("[S]tudies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment."); *Owner-Operator Indep. Drivers Ass'n, Inc. v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007) (failure to do so is a "serious procedural error").

And no wonder the SEC didn't preview these articles supposedly providing the justification for the entire Rule. For example, the *lead* supporting article concedes it does not even specifically address climate risk but instead looked only at "social issues more generally." Ex.A.647n.2737. The Rule then admits that there are "seemingly contradictory empirical results" regarding "climate-related risks and asset prices." Ex.A.648n.2745. That is as close to a confession of "mixed" evidence as the Court will see—and thus the Rule lacks substantial evidence. *Bus. Roundtable*, 647 F.3d at 1151.

*Third*, as explained above, the types of climate-risk and GHG emissions materials that the Rule mandates for disclosure are highly subjective and speculative. The Rule mandates "authoritative-looking

results" that are ultimately "high-priced guesses" that will "spam investors" with useless information. Ex.B.1–3. That is arbitrary and capricious. *See Bus. Roundtable*, 647 F.3d at 1150–51.

## C.    The Rule Violates the First Amendment.

Petitioners are also likely to succeed because the First Amendment prohibits the SEC from seeking disclosure of political issues under the guise of disclosure requirements.

In *NIFLA v. Becerra*, the Supreme Court held that a compelled disclosure is subject to strict scrutiny (as a content-based regulation) unless it falls into one of two categories: (1) "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech'"; or (2) regulation of "professional conduct, even though that conduct incidentally involves speech." 585 U.S. 755, 768 (2018).

The Rule requires disclosure of information that is "hardly factual and non-ideological," *NAM v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), because climate change in general is a politically charged matter, and the frameworks used are controversial. Whether emissions and climate change are material to corporate performance is a strongly debated

political matter, and the disclosures are incredibly subjective and manipulable (as explained above).

The Rule even expressly demands that companies "[d]escribe the board of directors' oversight of climate-related risks." Ex.A.852. The Rule forces Petitioners to take a side in the climate debates.

Nor is the SEC "evenhanded." *AMI. v. U.S. Dep't of Agric.*, 760 F.3d 18, 34 (D.C. Cir. 2014) (Kavanaugh, J., concurring). The Rule does not address directly analogous matters that are contrary to the SEC's favored view on climate and environmental matters—e.g., the SEC doesn't contemplate the risk that the government *stops* providing subsidies to "green" companies. That is a tell-tale sign of a controversial regime masquerading as a disclosure rule.

Because the Rule seeks controversial information, it triggers strict scrutiny, which it fails. Intermediate scrutiny should not apply because the proposed rule regulates far more than "speech proposing a commercial transaction," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561–62 (1980), but even if intermediate scrutiny did apply, the proposed rule would still fail.

There is no sufficient government interest because the SEC has not demonstrated that requiring such exhaustive disclosures yields an important effect. In fact, the evidence is to the contrary. "[I]t is plainly not enough for the Government to say simply that it has a substantial interest in giving consumers information. After all, that would be true of any and all disclosure requirements." *AMI*, 760 F.3d at 31 (Kavanaugh, J., concurring). And "'consumer curiosity alone is not a strong enough state interest' to sustain a compelled commercial disclosure," even when it is of accurate, factual information. *AMI*, 760 F.3d at 32. Yet the Rule repeatedly invokes consumer interest as its driving force. *E.g.*, Ex.A.47.

The D.C. Circuit has cautioned Congress itself against "requir[ing] issuers to disclose the labor conditions of their factories abroad or the political ideologies of their board members, as part of their annual reports[.] Those examples, *obviously repugnant to the First Amendment*, should not face relaxed review just because Congress used the 'securities' label." *NAM*, 800 F.3d at 555 (emphasis added). The same logic holds for forcing companies to participate in a dictated and confined way to the climate-change dialogue.

For its part, the Rule addresses narrow tailoring only with *ipse dixit* that its requirements are "appropriately tailored." Ex.A.72. But as explained above, the Rule "is anything but a delicate exercise" of the SEC's disclosure power. *BST*, 17 F.4th at 612.

At the very least, concerns about the constitutionality of the Rule caution strongly against the SEC's broad interpretations of its authority to mandate disclosure. *See* Part I.A *supra*.

## II. Petitioners Will Suffer Irreparable Injury.

"[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *BST Holdings*, 17 F.4th at 618. The SEC itself estimated that compliance with the Rule will cost at least $4.1 billion, with over $2.6 billion of that in the first year alone. *See* Ex.E.15.

The formal data collection needed to comply with the Rule's severe weather event and climate-related risk disclosures begins in January 2025, but Petitioners will start incurring nonrecoverable compliance costs *now* because they must create "elaborate internal control systems and disclosure control procedures to capture and distill information related to physical and transition risks, severe weather events, severe

natural conditions, and greenhouse gas emissions." Ex.B.2; Ex.E¶¶23–25. Petitioner Nomad faces an especially imminent and irreparable harm because, as a small non-public company, it has no systems in place for collecting piles of compliance data, and thus will have to stand up those processes entirely from scratch so it can report them to Liberty. Ex.F.¶¶11–12.

Petitioners will also imminently suffer impairment of First Amendment rights, including from their boards being forced to engage in the climate-change dialogue. Part I.C, *supra*. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v Burns*, 427 U.S. 347, 373 (1976).

## III. The Equities and Public Interest Strongly Favor a Stay.

"[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n*, 141 S. Ct. at 2490. The SEC has no equitable interest in enforcement of an invalid rule, let alone one that marks a sudden and significant intrusion of the administrative state. By contrast, Petitioners have helped fuel the country's growth, provided significant improvements in quality of life, and helped lower energy bills

for consumers. Ex.D¶¶14–21. The Rule seeks to cripple traditional-energy sector, with Petitioners and the general public paying the price.

## CONCLUSION

The Court should grant an administrative stay and a stay pending review.[7]

---

[7] Because the Rule lacks statutory authority, the Court should stay the Rule in its entirety. *See also Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) (staying entire rule despite a severability clause).

March 8, 2024

Respectfully submitted,

/s/ R. Trent McCotter

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd # 407
Denver, CO 80206

R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
Caleb Orr
BOYDEN GRAY PLLC
801 17th Street Nw., Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

*Counsel for Petitioners*

## CERTIFICATE OF CONFERENCE

As required by 5th Cir. Rule 27.4, I certify that I emailed the SEC's Office of the Secretary, which is the agency designee regarding this motion, to ascertain the SEC's position on this motion. The SEC's Office of General Counsel responded and said the SEC opposes a stay.

/s/ R. Trent McCotter
R. Trent McCotter

## CERTIFICATE OF SERVICE

I certify that on March 8, 2024, the foregoing document was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I further certify that I will timely serve the following:

Tracey Hardin
Daniel Staroselsky
John Rady
Office of the General Counsel
Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549
(202) 551-5048
hardint@sec.gov

/s/ R. Trent McCotter
R. Trent McCotter

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5162 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ R. Trent McCotter
R. Trent McCotter
