# Ex. E
## (Stock Declaration)

| LIBERTY ENERGY INC. ET AL., | |
| v. | |
| SECURITIES AND EXCHANGE COMMISSION ET AL. | |

## DECLARATION OF MICHAEL STOCK

I, Michael Stock, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Chief Financial Officer of Liberty Energy Inc. ("Liberty"). I am responsible for oversight of the financial and accounting aspects of Liberty, including capital formation, debt and equity financing, and investor relations.

2. Liberty shares are traded on the New York Stock Exchange under the ticker LBRT.

3. As a publicly traded company, Liberty is subject to several ongoing reporting requirements under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Sarbanes-Oxley Act of 2002 ("SOX"), and registration reporting requirements under the Exchange Act and the Securities Act of 1933, among other federal securities laws. Consistent with its obligations under the federal securities laws, Liberty files with the Securities and Exchange Commission ("SEC") periodic reports and registration statements, including with audited financial statements, among other reports and disclosures.

4. Liberty is not currently subject to European climate-related financial disclosure obligations or California's recently enacted SB 253 (titled "Climate

1

Corporate Data Accountability Act") or SB 261 (titled "Greenhouse Gases: Climate-Related Financial Risk").

5. Liberty expends significant resources, both internally and externally, to comply with its reporting and disclosure requirements under the federal securities laws. Liberty presently employs the service providers Deloitte & Touche LLP ("Deloitte") and Protiviti Inc. ("Protiviti") to assist with the preparation of our securities filings. I estimate that Liberty spent approximately $3 million for Deloitte's annual audit activities and over $500,000 with Protiviti last year in complying with these obligations.

6. The preparation of Liberty's periodic reports under the Exchange Act is effectively a year-long process. Quarterly financial statements and associated disclosures are prepared by management at the end of each of the first three fiscal quarters of the year and filed with the SEC on Form 10-Q ("10-Q"). Deloitte conducts a review prior to the filing of each 10-Q. These financial statements and disclosures are then combined along with additional information regarding our business to prepare our Annual Report on Form 10-K ("10-K"). Deloitte provides an audit opinion prior to filing the 10-K and Protiviti also provides related written work product to support our preparation of the 10-K.

7. I am generally aware of the SEC's new rule, *The Enhancement and Standardization of Climate-Related Disclosures for Investors* ("Climate Rule"). Liberty is a large accelerated filer subject to the Climate Rule.

*The Climate Rule Irreparably Harms Liberty*

8. The Climate Rule imposes new disclosure obligations for severe weather and other natural events (Regulation S-X disclosures), climate-related risks, and greenhouse gas (GHG) emissions (Regulation S-K disclosures). While the Rule facially purports to trigger some of these obligations only when they would be "material" to a reasonable investor, the Rule compels many disclosures that are not material. *See* Ex.G to Motion.

9. The Climate Rule's compliance dates phase in for different requirements depending on the status of the registrant as (1) a large accelerated filer, (2) an accelerated filer, or (3) a non-accelerated filer, emerging growth company (EGC), or smaller reporting company ("SRC"). Ex.A.589.

10. For large accelerated filers, the compliance date for all Regulation S-K and S-X disclosures required by the Climate Rule (other than those described in ¶ 11, *infra*) is fiscal year 2025 (i.e., annual reports and other disclosures filed in 2026). Ex.A589. For accelerated filers, the date is fiscal year 2026 (filed in 2027), and for non-accelerated filers and SRCs, fiscal year 2027 (filed in 2028). Ex.A.589.

11. For large accelerated filers, the compliance date for Regulation S-K disclosures requiring the reporting of expenses that result from activities to mitigate or adapt to climate-related risks (Item 1502(d)(2)), implementing a transition plan, (Item 1502(e)(2)), or meeting a climate-related target or goal (Item 1504(c)(2)) and the reporting of Scopes 1 and 2 GHG emissions (Item 1505) is fiscal year 2026 (filed in 2027). Ex.A.589. The compliance date for providing limited assurance for GHG emissions disclosures is fiscal year 2029, and for reasonable assurance, fiscal year

2033. Ex.A.589.

12.     Liberty is a large accelerated filer with a December 31st fiscal year-end. Liberty must begin complying with the Climate Rule—specifically, applicable Regulation S-K and S-X requirements—in fiscal year 2025. These requirements include the disclosure of company expenditures and capitalized costs incurred during the fiscal year as a result of, and financial estimates and assumptions impacted by, "severe weather events and other natural conditions," Regulation S-X § 210.14-02, Ex.A.844–47, board and management oversight of detailed climate-related risks, Regulation S-K Item 1501, Ex.A.852–53, and climate-related risks, including both physical and transition risks affecting the company's business operations, products or services, suppliers or purchasers, and research and development, among others, Regulation S-K Item 1502, Ex.A.853–56. Where these requirements apply only to purportedly "material" information, Liberty must also first assess whether any information covered by the requirements would be material according to the SEC's definitions. Ex.A.742–43.

13.     Liberty ordinarily files its annual report for each fiscal year in February of the following year. For example, we filed our Annual Report on Form 10-K for the fiscal year ending December 31, 2023 with the SEC on February 9, 2024. In my experience, we file our 10-K earlier in the year than some other public companies that also follow a December 31st fiscal year-end calendar. We file our 10-K early to provide our investors with greater time to review our financial information, both for their general investment purposes and so they can be better informed before our annual meeting, which is regularly held in the spring. Our Annual Report plays a

4

critical role in informing our investors about our business.

14. While Liberty expects to file its first annual report containing information required by the Climate Rule in early 2026, the report must cover business activities occurring our fiscal year 2025, which begins on January 1, 2025. As a result, Liberty must imminently prepare our internal compliance and reporting processes to comply with the Rule, which will require promptly engaging third party service providers.

15. Based on the SEC's estimates, the Climate Rule's direct compliance costs will be at least $4.1 billion, with over $2.6 billion of that onus in the first year alone. *Compare* Ex.A.823–24 (number of affected parties by burden) *with* 740 (direct cost per burden).[1] The SEC estimates that the average direct cost for companies to comply Regulation S-K and S-X requirements alone—the requirements Liberty is subject to begin measuring starting January 1, 2025—would be $827,000 per company in the first year of compliance. Ex.A.740.[2] All of this is without considering the initial costs required to assess whether any of the Climate Rule's required disclosures are

---

[1] Arriving at this estimate requires matching the SEC's estimated direct compliance costs per burden imposed by the Rule, *see* Ex.A.740, with the number of affected parties for each burden, which the SEC describes as "Disclosure Item[s]," Ex.A.823–24. The estimated costs for Regulation S-K Items 1501, 1502(a) through (e) and (g) and 1503, Ex.A.740, are matched with the Disclosure Item "Governance, strategy, and risk management" for each SEC-filed form, Ex.A.823–24, estimated costs for "[s]cenario analysis" Ex.A.740, with "Scenario analysis," Ex.A. 823–24, estimated costs for "Scope 1 and 2 GHG emissions" Ex.A.740, with "Scope 1 and 2 emissions," Ex.A.823–24, estimated costs for "amendments to Regulation S-X," Ex.A.740, with "Financial statement disclosures," Ex.A. 823–24, and estimated costs for "[l]imited assurance" or "reasonable assurance" for emissions disclosures, Ex.A.740, with Scope 1 and 2 emissions, Ex.A.823–24.

[2] The SEC estimates $327,000 in first-year compliance costs for the Regulation S-K governance requirements and $500,000 in first-year compliance costs for Regulation S-X amendments. Ex.A.740.

5

material under the SEC's definitions, which the SEC acknowledged would pose costs but did not provide an estimate. Ex.A.742–43.

16. We have begun mapping out a strategy to comply with the Climate Rule's requirements. We are currently estimating the amount we would need to spend from now until the publication of our fiscal year 2025 annual report to comply with the Climate Rule, and annually thereafter.

17. Because the Climate Rule is unprecedented in so many respects, we cannot place an exact figure on how much compliance with it will cost. But the regulatory regime the Rule imposes is on par with that required by Sarbanes Oxley (SOX). Indeed, one commentator has called the Climate Rule "the Next SOX for Internal Audit,"[3] and SEC Commissioner Hester Peirce has similarly compared the Climate Rule's compliance costs to those under SOX.[4] Further, the SEC has estimated that assurance compliance by an individual company with the Climate Rule alone would actually cost *more* than an individual company's compliance with SOX.[5]

18. Our direct, out-of-pocket compliance-related compliance costs for SOX exceeded $500,000 for the 2023 fiscal year. This does not include the costs for the

---

[3] Richard Chambers, *SEC Climate Disclosure Proposal May Be the Next SOX for Internal Audit*, AUDITBOARD (Mar. 31, 2022), https://www.auditboard.com/blog/sec-climate-disclosure-proposal-may-be-the-next-sox/.

[4] SEC Comm'r Hester Peirce, *We are Not the Securities and Environment Commission—At Least Not Yet*, Mar. 21, 2022, https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321 ("The [Climate Rule's] attestation mandate could be a new sinecure for the biggest audit firms, reminiscent of the one given them by Section 404(b) of the Sarbanes-Oxley Act.").

[5] *Compare Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36657 (June 5, 2003) ($91,000 per company), *with* Ex.A at 740 ($150,000 reasonable assurance cost for a large accelerated filer's Scope 1 and Scope 2 emissions).

time and effort of our internal personnel or the costs for our contracting with Deloitte, our independent registered accounting firm, to provide an attestation opinion on SOX matters. I would estimate that our total annual costs for SOX compliance exceed $1 million per year.

19. Our current annual rate of spend for SOX activities benefits from learnings and efficiencies gained from having performed this compliance task several years in a row. Our first year SOX compliance efforts and costs were considerably higher, as is normal in the industry. For example, near the time of implementation of SOX in 2005, a survey of Members of Financial Executives International estimated first-year compliance costs for SOX at $4.36 million for organizations with average sales of $5 billion a year.[6] In today's dollars, that figure is even higher.

20. Thus, even under a very conservative approach for estimating costs, the compliance costs for the Climate Rule once we have been doing this work for several years would still be several hundred thousand dollars per year.

21. The SEC itself has recognized that the Climate Rule will impose significant and immediate compliance costs. For large accelerated filers like Liberty, the SEC estimated that compliance costs for the first year of compliance would, on average, equal $827,000. Ex.A.740.[7] The SEC further estimated that some large registrants will incur an estimated $872,000 in first-year compliance costs. Ex.A.742.

---

[6] Daniel L. Gonzales, *The Costs and Benefits of Sarbanes-Oxley Section 404*, Presented at the National Association for Business Economics' 21st Annual Washington Economic Policy Conference, Mar. 21, 2005, https://pcaobus.org/news-events/speeches/speech-detail/the-costs-benefits-of-sarbanes-oxley-section-404_126.

[7] *See* note 2, *supra*.

7

The first-year costs will be even greater than these estimates because companies will have to set up the required processes to collect and track relevant information, such as to determine which disclosures covered by the Climate Rule are material.

22. These costs are so high because the Climate Rule represents the most expansive single-issue regulatory framework ever adopted by the SEC, requiring granular disclosures of climate-related risks and impacts and companies' measurement and oversight.

23. Our compliance costs will begin accruing immediately because of the lengthy ramp-up period required to produce the reports required by the Climate Rule. As noted above, to prepare a report issued covering fiscal year 2025, by the end of *this year* (2024) we would need to begin (i) conducting a materiality assessment of all information that the Rule requires disclosure of if "material", (ii) where that information is material according to the SEC's definitions (or where the Rule requires disclosure regardless of materiality), tracking that information and preparing disclosures, and (iii) defining, identifying, and developing the capacity to track company expenditures, costs, and impacts on our financial assumptions and estimates associated with "severe weather events and other natural conditions." That means we need to create a collections framework for such data. That process would include hiring outside consulting groups to evaluate, prepare, and vet the voluminous data and data collection frameworks required by the Climate Rule.

24. In addition to hiring outside consulting groups, we will imminently spend additional efforts internally to create disclosure controls and procedures for reviewing the disclosures mandated by the Climate Rule.

25. Once spent, we cannot recover these various compliance costs.

*The Climate Rule Also Will Impose Disproportionate Costs on Small Entities Within Liberty's Organizational Boundaries*

26. The Climate Rule imposes several requirements that registrants disclose information that is attributable to third parties. Among other obligations requiring the collection of information from third-party "suppliers," "purchasers," and "counterparties," Ex.A.854, the Rule imposes the burden of collecting climate-related information and GHG emissions from entities included in a registrant's consolidated financial statements.

27. First, the Rule imposes on registrants the burden to investigate whether entities included in the registrant's consolidated financial statements have "climate-related risks." The proposed version of the rule would have required the disclosure of climate-related risks reasonably likely to have a material impact on the registrant, including "on its business or consolidated financial statements."[8] The final Rule replaced "consolidated financial statements" with impacts on the registrant's "results of operations" and "financial condition" but noted that these changes "do not create any substantive differences compared to the proposed rules." Ex.A.90–91.

28. Second, the Rule imposes burdens on registrants to collect and potentially disclose the GHG emissions of entities included in their consolidated financial statements. The Rule requires that large accelerated filers like Liberty report Scope 1 and 2 GHG emissions produced within their "organizational boundaries,"

---

[8] *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21334, 21468 (Apr. 11, 2022).

9

Ex.A.859–60, which the Rule defines as "operations owned or controlled by a registrant," Ex.A.852. The Rule presumes that a registrant's organizational boundaries includes entities and operations included in the registrant's consolidated financial statements. Ex.A.860. If a registrant uses organizational boundaries that materially differ from the scope of its consolidated financial statements, the registrant must provide an explanation of this difference. Ex.A.860.

29. From time to time, we make equity investments in start-up or early-stage companies that have new or innovative technologies and the potential to reduce greenhouse gas emissions. Examples of these investments include: (a) Nomad Proppant Services LLC ("Nomad"), a business that is focused on mobile, local mining of frac sand near wellsites which, among other ecological benefits, reduces greenhouse gas emissions by drastically decreasing the number of truckloads needed to deliver sand; (b) Fervo Energy, a business that focuses on producing carbon-free electricity through geothermal heat; and (c) Natron Energy, Inc., a business that produces sodium-based batteries with chemistry that stores and releases energy more often, and more efficiently than any other battery available in the world (together, the "Liberty Early Stage Investments").

30. The Liberty Early Stage Investments are in companies that are small businesses. None of them are publicly traded, and therefore on their own would not be required to comply with the Climate Rule.

31. Each of the Liberty Early Stage Investments are currently accounted for in Liberty's financial statements using the equity method and thus would be included in Liberty's obligations under the Climate Rule.

32. As a result, Liberty must, at minimum, include these companies in its materiality assessments for climate-related risks and impacts and, if they present either material risks or impacts (as defined by the Climate Rule) or non-material risks or impacts that the Rule nonetheless requires the disclosure of, Liberty will be obligated to disclose those risks or impacts. Meeting these obligations will require Liberty to investigate these companies, which will impose costs on Liberty and those companies.

33. Each of the Liberty Early Stage Investments are currently accounted for in Liberty's financial statements using the equity method and thus would also be considered within Liberty's "organizational boundaries." As a result, these companies will be required to track and report their Scope 1 and Scope 2 emissions to Liberty annually, so that Liberty can include a proportionate share of this data in its own SEC reports if "material." We expect it will not be possible to use another method of determining our organizational boundaries that would exclude Nomad while remaining consistent with the Rule's definition.

34. This is unduly burdensome for smaller businesses with limited staff and could ultimately raise the cost of capital for similar small businesses, who will no longer be able to turn to publicly traded companies as a source of equity financing due to the burden of compliance with the Climate Rule.

Dated: March 8, 2023                   _____
                                                      Michael Stock