No. 24-60109
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

**LIBERTY ENERGY INC., NOMAD PROPPANT SERVICES LLC,**

*Petitioners,*

v.

**SECURITIES AND EXCHANGE COMMISSION and UNITED
STATES OF AMERICA,**

*Respondent.*
_____

On Petition for Review of an Order and Rule of the
Securities and Exchange Commission
_____

**REPLY IN SUPPORT OF EMERGENCY MOTION FOR
ADMINISTRATIVE STAY AND
STAY PENDING JUDICIAL REVIEW**
_____

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd # 407
Denver, CO 80206

R. Trent McCotter
 *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
Caleb Orr
BOYDEN GRAY PLLC
801 17th Street Nw., Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

# CERTIFICATE OF INTERESTED PERSONS

## *Liberty Energy Inc. v. SEC*

No. 24-60109

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Liberty Energy Inc. Liberty is a publicly traded entity. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. Nomad Proppant Services LLC. Liberty Energy Inc. holds more than 10% of Nomad's stock.

3. R. Trent McCotter

4. Jonathan Berry

5. Michael Buschbacher

6. Jared M. Kelson

7. Caleb Orr

8. Boyden Gray PLLC

ii

9.     Katherine C. Yarger

10.    Lehotsky Keller Cohn LLP

11.    Securities and Exchange Commission

12.    United States of America

13.    State of Louisiana

14.    State of Mississippi

15.    State of Texas

16.    Autumn Patterson

17.    Justin Matheny

18.    Wesley Williams

19.    Tracey A. Hardin

20.    John R. Rady

21.    Daniel Staroselsky

22.    Texas Alliance of Energy Producers

23.    Domestic Energy Producers Alliance

24.    Luke A. Wake

<u>/s/ R. Trent McCotter</u>

R. Trent McCotter

*Counsel of Record for Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................v

ARGUMENT ........................................................................ 1

I.    The Court Has Express Statutory Authority to Grant a Stay ........ 1

II.   Petitioners Are Likely to Succeed ...................................... 3

III.  Petitioners Will Suffer Irreparable Injury ...................... 14

IV.   The Equities and Public Interest Strongly Favor a Stay .............. 15

CONCLUSION..................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021)..................................................... 7

*BST Holdings, LLC v. OSHA,*
    17 F.4th 604 (5th Cir. 2021).................................................... 1

*Bus. Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011) ............................................... 11

*Contender Farms, LLP v. DOA,*
    779 F.3d 258 (5th Cir. 2015)....................................................... 3

*Corrosion Proof Fittings v. EPA,*
    947 F.2d 1201 (5th Cir. 1991) ................................................ 11

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019)............................................................. 3

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000).................................................................. 7

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011)................................................................... 8

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023)............................................... 1, 11

*NAM v. SEC,*
    748 F.3d 359 (D.C. Cir. 2014) ............................................... 13

*NAM v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) ............................................... 13

*OOIDA v. FMCSA,*
    494 F.3d 188 (D.C. Cir. 2007) ............................................... 12

*Rest. L. Ctr. v. DOL,*
   66 F.4th 593 (5th Cir. 2023)..................................................... 14

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ..................................................... 3

*TSC Indus., Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976)............................................................8, 12

*Wages & White Lion v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ................................................... 1

*West Virginia v. EPA,*
   597 U.S. 697 (2022)............................................................. 6, 7

## Statutes

15 U.S.C. § 77g.......................................................................... 8

15 U.S.C. § 78*l*......................................................................... 8

28 U.S.C. § 2112 ....................................................................... 1

## Other Authorities

FRAP 18.................................................................................... 1

# ARGUMENT

## I.    The Court Has Express Statutory Authority to Grant a Stay.

Citing FRAP 18, the SEC argues undersigned counsel's formal request to stay the proposed rule (made to the SEC in 2022) did not give the SEC "an opportunity to address specific arguments for a stay of the [Rule] *as adopted*." Opp.6. But the SEC has now twice declined to stay the Rule even *after* its issuance, which easily satisfies FRAP 18. *Wages & White Lion v. FDA*, 16 F.4th 1130, 1135 n.1 (5th Cir. 2021). Further, the SEC's point is that the Rule changed so dramatically that a request to stay the *proposed rule* wouldn't count as a request to stay the final Rule. That confirms Petitioners' point below (Part II.C) that the Rule is unlawful because it was insufficiently "alike in kind" to the proposed rule, and thus commentators could not "have reasonably anticipated the Final Rule." *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023).

The SEC also argues a stay is "premature" because the Rule may be subject to the multi-circuit lottery. Opp.6. But Congress *expressly* authorized this Court to grant relief *before* the lottery, 28 U.S.C. § 2112(a)(4), and this Court has previously done so, *BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021).

The SEC notes "concerns" about Nomad's standing because only Liberty is "required to make any disclosures under the [Rule]." Opp.8. But the Rule recognizes registrants (i.e., Liberty) must "seek[] input from third parties" to comply with the "requir[ed] disclosure of material impacts from climate-related risks on purchasers, suppliers, or other counterparties," among "other[s]." Ex.A.657. That imposes "compliance burden[s]" and "increased costs" on "third parties." Ex.A.657–58. Nomad is a prime example. Its declaration says it must "undertake new expenses to investigate our climate-related risks" to report to Liberty, Ex.F.¶11–12, which owns a controlling interest in Nomad that constitutes a "relationship" likely to impact Liberty, Ex.A.658.

The SEC also claims Nomad won't have to collect its GHG emissions to report to Liberty, Opp.9, but that's incorrect because it's "not [] possible to use another method of determining [Liberty's] organizational boundaries that would exclude Nomad" as a source of Liberty's emissions. Ex.E.¶33.

Finally, the Rule harms Nomad's access to capital, which is its own injury. Ex.F.¶13.

Nomad has standing because it will directly incur harm flowing from the Rule. *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (standing where party is "'an object of the action'"); *Contender Farms, LLP v. DOA*, 779 F.3d 258, 265 (5th Cir. 2015) (Court looks to "'practical impact'" of rule).

## II.    Petitioners Are Likely to Succeed.

### A.    The Rule Triggers the Major-Questions Doctrine.

The theme of the SEC's opposition is that the Rule is an ordinary exercise of the agency's disclosure powers and that the SEC remains "agnostic" on climate change. Opp.1.

The Court should not be fooled. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (courts are "'not required to exhibit a naiveté from which ordinary citizens are free'"). The Rule "is climate regulation promulgated under the Commission's seal." Ex.C.1 (Comm'r Uyeda, dissenting). The 886-page Rule "require[s] comprehensive and standardized climate-related disclosures." Ex.A.646.

It even says the quiet part out loud: "mandatory reporting of GHG emissions results in reduced aggregate reported emissions among affected firms." Ex.A.784.

The Rule embodies climate exceptionalism at every turn by "insist[ing] that climate issues deserve special treatment and disproportionate space in Commission disclosures and managers' and directors' brain space." Ex.B.1 (Comm'r Peirce, dissenting).

For example:

- "For no other risk does the Commission require prescriptive, forward-looking disclosure of the risk's impacts on the company's strategy, business model, outlook, financial planning, and capital allocation." Ex.C.2.

- The "requirement to disclose GHG emissions and obtain an attestation report on such disclosure is in a class of its own without comparison in the Commission's disclosure regime." *Id*.

- The Rule "requires disclosure of climate related targets and goals, even though the Commission has no similar requirements for a company's targets and goals related to other, more important matters affecting the company, such as financial performance." *Id*.

- Companies must describe "the process of how a company's board oversees and is informed of climate risk, how a company's management assesses and manages material climate risk, which

management positions manage climate risk and the associated expertise, the geographic location of physical climate risk, and how climate risks affect items like a company's '[p]roducts or services,' 'suppliers,' climate mitigation activities, and 'expenditures for research and development.'" Ex.B.3.

- The Rule acknowledges that "existing rules already require disclosure about material risks," but the SEC nonetheless "continue[s] to believe that a specific disclosure item focusing on managing material climate-related risks is warranted." Ex.A.193.

- "In no other context is a company required to provide an explanation of expenses that exceed one percent of income before taxes and analyze the significant contributing factor to the expense," Ex.C.2, but the Rule specially compels that explanation for expenses related to "severe weather events and other natural conditions," Ex.A.845.

- Far from remaining "agnostic," the Rule's definitions of transition risk and climate-related risk always assume "*reduced* market demand for carbon-intensive products." Ex.A.850.

At every step, the Rule "elevates climate above nearly all other issues facing public companies." Ex.C.2. This "special treatment" of

climate eviscerates the SEC's "feign[ed] agnosticism about how public companies should think about climate risk." Ex.B.3.

The Rule ventures "outside of [the SEC's] lane." Ex.C.2. Add in the enormous economic consequences, Ex.E.15, the repeated failure of legislation on this topic, Mot.12, and the Supreme Court's recognition that climate change is a significant political matter, *see West Virginia v. EPA*, 597 U.S. 697, 731 (2022)—and the Rule easily triggers the major-questions doctrine.

## B.    The Rule Lacks Clear Statutory Authority.

***Congress Knows How to Provide Clear Authority—and Did Not Do So Here.*** The SEC argues its disclosure powers are broadly written, Opp.10, but that argument fails.

*First*, Congress has given the SEC clear authority to mandate *other* forms of non-traditional disclosures, e.g., conflict minerals, extraction of oil and natural gas, and executive pay—but *not* climate. Mot.16. This shows: (1) Congress clearly doesn't view the SEC's generic disclosure statutes as particularly broad, and (2) Congress knows how to give the SEC the power to compel non-traditional disclosures but has not done so for climate. Mot.12.

*Second*, the Court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Congress already provided detailed climate-disclosure powers to the EPA. Mot.10–11. The SEC argues the EPA's authority is "different." Opp.13. But it defies "common sense" that Congress would've given the SEC the authority to demand broader environmental disclosures (via far vaguer statutes) than it already gave to the EPA. Further, the EPA regime demonstrates that Congress knows how to provide clear authority for these types of disclosures—and didn't do so for the SEC.

*Third*, similar reliance on merely "plausible" interpretations of generic statutes is precisely what failed in other major-questions cases. *W. Va.*, 597 U.S. at 723; *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2488 (2021).

In short: we know what "clear congressional authorization" looks like, *W. Va.*, 597 U.S. at 723, and there is none here. The SEC's own longstanding repudiation of its authority in this realm confirms the point.

***There Is No Clear Authority for the Rule's Watered-Down Approach to "Materiality."*** The SEC does not dispute that many aspects of the Rule either forgo materiality altogether or slip in modifiers like material only "to" or "on" a *specific aspect* of a company. Mot.17–18; Ex.G (chart). Rather, the SEC argues that materiality is required only under certain antifraud provisions. Opp.13. But those statutory provisions *likewise* do not expressly include the word "material," and yet the Supreme Court has *still* identified a materiality requirement in them. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

The materiality limitation derives from statutory text and context. *First*, Congress dictated that disclosure requirements must be in the "public interest" and for the "protection of investors," 15 U.S.C. §§ 77g(a)(1), 78*l*, and the Supreme Court has held that "simply … bury[ing] the shareholders in an avalanche of trivial information" "is hardly conducive to informed decisionmaking" and thus would "accomplish more harm than good." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). Mandating disclosure of non-material information *hurts* the "public interest" and investors, and thus isn't statutorily authorized.

*Second*, Congress cabined the SEC's disclosure powers by appending lists of specific types of information, nearly all of which focus on balance-book and management details. Mot.13–15. Under standard canons of construction, those lists show the SEC has clear authority only for balance-book type information. The SEC again claims that the Rule requires such ordinary information, Opp.11–12, but the Rule is anything but ordinary, Part II.A, *supra*.

Accordingly, there is no *clear* authority to mandate disclosures absent materiality.

The SEC next argues the Rule does not necessarily deem exposure to transition risk as mandating disclosure of Scope 1 and 2 emissions. Opp.14. But the Rule goes out of its way to provide one—*and only one*—"remind[er]" to companies on this point, saying they "should consider" "whether [they] may be exposed to a material transition risk" if they operate "in a jurisdiction that has made a GHG emissions reduction commitment." Ex.A.99–100, 854. The Rule then makes that example the leading circumstance when Scope 1 and 2 emissions are likely to be material. Ex.A.246–47. There is no need to read between the lines.

The one example the Rule musters of when Scope 1 and 2 *won't* be material in the face of transition risk is when a new law "restricts the sale of [a company's] products based on the technology it uses." Ex.A.247. But that isn't really a climate-related transition risk at all, proving Petitioners' point that this is a null set. Further, the SEC altogether ignores the broad definition of "transition risk" itself. Mot.19.

Elsewhere, the Rule admits the obvious: the SEC is imposing "mandatory disclosure of Scope 1 and Scope 2 emissions data." Ex.A.682.

\* \* \*

The Rule lacks clear authority and violates the major-questions doctrine.

### C.    The Rule Is Arbitrary and Capricious.

***The SEC Failed to Acknowledge Its Change in Position***. Rather than explain its seismic shift on climate matters, the SEC still insists there has been no change, Opp.19, despite the overwhelming contrary evidence, Part II.A, *supra*. Because the SEC refuses to acknowledge and explain this change, the Rule is arbitrary and capricious. Mot.22.

Relatedly, the Rule "differs quite dramatically from the propos[ed rule], both by excluding major provisions and including new rule

10

elements." Ex.B.3. "[T]he Proposed and Final Rule must be alike in kind so that commentators could have reasonably anticipated the Final Rule." *Mock*, 75 F.4th at 584. The SEC contends that counsel's request to stay the *proposed rule* did not give the SEC a sufficient "opportunity to address specific arguments for a stay of the [Rule] *as adopted*." Opp.6. This effectively admits that even the SEC itself could not have "reasonably anticipated the Final Rule" based on the proposal. *Mock*, 75 F.4th at 584.

**_The Rule Is Supported by "At-Best Mixed" Evidence._** The substantial-evidence test "'imposes a considerable burden on the agency,'" *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991), and cannot be satisfied by "at-best" "mixed" evidence of benefits, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011).

The Rule admits that *no study* has shown an overall positive effect on profitability or stock price as a result of mandating climate disclosures, while numerous studies found overall negative effects or no effect. Ex.A.658–59. That is not even "mixed" evidence—it is one-sided *against* the Rule's fundamental premise.

The SEC concedes the evidence of a link between stock returns and emissions is "seemingly contradictory," Ex.A.648n.2745, which qualifies as "at-best mixed" evidence of a core justification for the Rule. And for the supposed link between higher temperatures and reduced revenues, the Rule relies largely on articles the SEC never provided in the proposed rule. Mot.23. The SEC says there is only one example of that procedural violation, Opp.20, but a close review shows that 27 of the 34 articles cited for the Rule's core "benefits" were *never* mentioned in the proposed rule, Ex.A.646–50nn.2737–50. That is a "serious procedural error." *OOIDA v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007).

The SEC also claims the Rule is justified by individual investor demand, but the SEC points overwhelmingly to institutional and organizational comment letters. Ex.A.38–41nn.99–108. In any event, mere demand is insufficient because not "all facts which a reasonable shareholder might consider important" are actually *material*, especially where they lack a demonstrated connection to the financial performance that a "reasonable investor" seeks. *TSC*, 426 U.S. at 445.

### D.    First Amendment

The Rule's premise is that climate risks deserve special treatment, but that view is politically sensitive and highly speculative, and thus triggers serious First Amendment scrutiny. Mot.23–24. In response, the SEC again contends the Rule is just an ordinary disclosure regime, Opp.15, but again that's wrong, Part II.A, *supra*.

The SEC also insists the First Amendment applies "different[ly]" to securities regulations. Opp.15. The D.C. Circuit has forcefully rejected that view, holding the SEC cannot "regulate otherwise protected speech using the guise of securities laws" or by "us[ing] the 'securities' label." *NAM v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014).

Rather, even under lessened scrutiny, "the SEC ha[s] the burden of demonstrating that the measure it adopted would 'in fact alleviate' the harms it recited 'to a *material degree*.'" *NAM v. SEC*, 800 F.3d 518, 527 (D.C. Cir. 2015) (emphasis added). But the SEC still asserts nearly unlimited disclosure powers untethered from materiality, and even when there is scant evidence (at best) of the benefits of disclosure.

13

Further, the SEC can muster only that the Rule "might" (not *will*) be even-handed in its treatment of "'green companies'" vs. those seen as carbon-intensive. Opp.18.

This all confirms the Rule fails First Amendment scrutiny.

## III. Petitioners Face Irreparable Injury.

The SEC hangs its hat on the fact that the first reports containing the Rule's mandated disclosures won't be published until early 2026, Opp.21, but that ignores that the information for those filings covers the *entirety* of fiscal year 2025, Ex.A.589. As Petitioners' declarations show, that means they must immediately begin compliance efforts to create and operationalize the requisite systems. Ex.E¶¶23–25; Ex.F.¶¶11–12. The Rule imposes such expansive and novel requirements that affected companies—which often have extensive internal control requirements— cannot simply wait around. Anyone who has represented public companies knows Liberty is correct that they are *already* taking steps to comply.

Indeed, the Rule itself openly acknowledges there will be "immediate costs of compliance" for large-accelerated filers like Liberty. Ex.A.692.

The SEC suggests unrecoverable compliance costs are not irreparable, Opp.21, but this Circuit's caselaw is contrary and further deems those costs irreparable regardless of the dollar amount. *Rest. L. Ctr. v. DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

## IV.    The Equities and Public Interest Strongly Favor a Stay.

There is no government interest in an illegal rule. Mot.28. And the SEC makes *no* argument that it faces harm from staying that Rule. Meanwhile, Petitioners face imminent harms, as does the public, which relies on companies like Petitioners for cost-effective energy. Mot.28; Ex.D.

## CONCLUSION

The Court should grant the Motion.

March 13, 2024                          Respectfully submitted,

                                        /s/ R. Trent McCotter

Katherine C. Yarger                     R. Trent McCotter
LEHOTSKY KELLER COHN LLP                   *Counsel of Record*
700 Colorado Blvd # 407                 Jonathan Berry
Denver, CO 80206                        Michael Buschbacher
                                        Jared M. Kelson
                                        Caleb Orr
                                        BOYDEN GRAY PLLC
                                        801 17th Street Nw., Suite 350
                                        Washington, DC 20006
                                        202-706-5488
                                        tmccotter@boydengray.com

        *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I certify that on March 13, 2024, the foregoing document was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will serve all counsel who have appeared.


/s/ R. Trent McCotter
R. Trent McCotter

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2600 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ R. Trent McCotter
R. Trent McCotter